My name is Gabriel Colorado. I represent Hancock Enterprise. Hancock Enterprise is in bankruptcy. We filed a status report. I submitted it to the court. I don't know from the court's perspective what the status is of my client, but we consider the case no longer in effect against my client. So I'm only here to observe. I'm not going to argue with the permission of the court. All right. Thank you, Counselor. Thank you. What do you have in the record? Just because I think Twombly and Iqbal is right at the center for me here. And I'm trying to think in terms of if it weren't the United States government here, you know, I've affirmed motions to dismiss when people come in and they just throw a bunch of statistics and they don't show any sort of causal link. Now, I mean, Twombly and Iqbal, I mean, do change the legal landscape. And so you can't just say what's possible. You have to say what's plausible. And, you know, if anything, the United States government, you know, certainly has access to more than most people. So what in here is more than just discrepancy in statistics? It seems possible, but why can't you even just put, you had a motion to amend and you didn't even put one person in to say, okay, here's an Asian and a non-Asian that have similar credit, you know, this, that, you know, credit and look how they were treated differently. It just seems to me that you're doing the same thing as in Walmart, you know, show the statistics, show that people have discretion. Therefore, where there's smoke, there's fire. And Twombly and Iqbal say, you need a spark. Your Honor, we think we have the spark and there's a lot in your question. But first of all, the same standard applies to the United States under Iqbal and Twombly. As we all know, if a plausible claim of discrimination, contextual plausibility, allege facts that address the elements of the cause of action, give the defendants fair notice of the claim, allow them to defend, nudge the claim of clause from possible to probable. In this case, we did allege that. We, it's not a complex case. Obviously, both Iqbal and Twombly have a lot of other issues. But why can't you just come up with one person that shows a reason that similarly situated people that, and if it's not there in the whole thing, you've got the full force of the government sitting on top of people. With all due respect, first of all, under the ECOA, the United States doesn't have discovery power prior to filing suit. So the only information we had in this case were some loan files that were voluntarily turned over by the Federal Reserve Board, NARA Bank, and the car dealerships. We have no way of knowing whether that data was complete. In fact, the data in some of the files was inconsistent, which is why we evaluated it into different sort of categories and have a range of overages. We didn't have any discovery power. We only got what they voluntarily turned over, which was inconsistent, incomplete. We weren't able to do any discovery. We have no discovery power. In this case, the backdrop of this case, of course, is the Federal Reserve Board study. The Federal Reserve Board did a compliance review of NARA Bank, and it discovered that there were significant overages, the discretionary component of the loan rate that was charged higher to non-Asians than Asians, and they referred the case to the Attorney General under the ECOA or under their powers and said that they had a reason to believe, that's the language, that non-Asians were charged higher overages more often than Asians. At that point, we don't have any power to do any discovery. We have the data that the Federal Reserve Board turned over, these partial loan files. We have some loan files that we got from the defendants having sent them letters. We filed our initial complaint, which largely, well, exclusively relied on the Federal Reserve Board study. The district court dismissed that and said there weren't enough facts in there to make the claim plausible. The district court's order was a paragraph, five, six sentences long. Did you need to introduce the statistics at all to state a claim? In our view, no. The first complaint was sufficient and could have been sufficient. We had 15 days to amend, so we didn't have to get to that issue of whether to appeal that or whether it was sufficient. But in our view, yes, the current complaint with the statistic has more in there than we need, not less, and the first one was sufficient. So in the 15 days that we had, we did our own independent review of the loan files and found that the statistics showed that for both Union Auto and HKE, the mean overages of the discretionary component of the rates was significantly higher for non-Asians than Asians. Mr. Chandler, a few moments ago, you told us you only had very limited statistics. Limited data files. All right. The 1,200, the number 1,200 in terms of the number of loans, total loans, where does that come from then? I believe that all comes from the Federal Reserve Board. It comes from all the files we got from both the Federal Reserve Board and from the defendants informally. There were 3,000 files as to one defendant and 1,400 files as to the other defendant. We broke it down by Asians and non-Asians and then ran the statistics, which we ran, by the way, in a number of ways, although some of that is not particularly relevant. So did those files have credit scores and things like that, too? That's a good question, Your Honor, and I was going to get to that. Thank you. What's important to note here is that the objective component of the loan rates, the credit worthiness of the borrowers, the terms of the deal, all of that is taken into consideration in the buy rate. This is a two-part final interest rate. The contract rate has the buy rate and the overage. The buy rate is not an issue here, and that takes care of the credit worthiness of the various borrowers, the terms of the loan. The discrimination comes in is in setting the discretionary subjective overage rate, and that's where the complaint alleges that discrimination has sort of crept into this decision-making process. Well, but if you have all these files to get the statistics, what else is in those files? It just seems to me there'd be – it's not – they didn't – you compiled the statistics from those files, right? Right. And so there's certain other things in there, so why can't you just – you have how many files do you say you have there? We have about 4,000 files altogether. So there was nothing in any of those 4,000 files that could show more than just the statistics? Well, that's all we needed to show. I mean, again, we're talking about the sufficiency of the complaint here on the backdrop of the Federal Reserve Board study that already itself found a reason to believe that there was discrimination based on their study of these loan files. We get the loan files. We only got it voluntarily. They're not attested to. They're inconsistent data. We look at them using driver's – using names and photos, do our own statistical analysis, and conclude, as the Federal Reserve Board did, that the non-Asians were charged with statistically significantly higher overages under the subjective policy than the Asians. And in our view, that's certainly enough to make a plausible claim of discrimination that alleges facts that goes to the element of the cause of action, which could, by the way, be either an intent claim or a disparate impact claim. So the district court sort of oddly acknowledged that we could have brought – we have two theories to prove discrimination, but then went on to analyze the complaint only as a disparate impact case. That's not necessarily correct. We don't need to pick the theory when we file the complaint. How do you – if this case proceeds, how do you plan to show discriminatory intent? Well, there's a lot of ways we can show discriminatory intent, either relying on – using Arlington Heights, the Supreme Court's case, that statistics themselves can be evidence of discriminatory intent. But also, we haven't done any discovery, again. So if we take depositions of some of the sales officers, if we get other documents, maybe there's – hypothetically, maybe there's a memo or email saying, you know, let's try to charge non-Asians or Hispanics higher loan rates, or this is really great when this certain category of people on a racial or national basis come in. You know, we can suck more out of them in terms of interest rates. We don't know that, but that's why we have to do discovery. But again, the statistics themselves, and also taking all inferences in favor of the government, which the district court in this case seemed to take every inference against the government in reviewing the complaint, clearly makes out – You have to take the factual allegations is true, but you still have to state a plausible claim of discrimination and where that line is. Right, and what we've alleged specifically is that in exercising their discretionary pricing policy, they've discriminated against non-Asians by charging them higher loan rates. And the factual allegations supporting that are both the Federal Reserve Board study that reached the same conclusion – But that's conclusionary. Well – It's a conclusionary statement, right? That what they say and they – what specifically did they say when they referred it to you? I think the language was they had a reason to believe that non-Asians were charged overages more often and in greater amounts, and therefore they referred the case to the Attorney General. But isn't that conclusionary because there's no specifics there? Well, I mean, they looked at the files. We don't – that's – we're not really – that's the first complaint. So even assuming that's conclusionary, we do have the allegations we've made in the second complaint, which is based on our own review of the files, and we – that the statistical overages were in one case 35 to 155 basis points and with HKE, 20 to 90 basis points higher. That's all we could do in the 15 days we had to do it, and we think that's more than enough. Again, on the backdrop of the Federal Reserve Board study, we've alleged who was discriminated against, in what context, by the sales persons making their discretionary pricing policy. And we've shown by facts that it's had a disparate impact, which could be an intent case later on because, like in Arlington Heights, those facts are one – can be proof of intent. Now, this isn't a case – many of the discrimination cases we do, of course, are against public officials or facial classifications. In those cases, you might have statement of officials, and it's very easy to show intent because they'll say, yeah, we did it for this reason, and the litigation's going to be defending that classification or defending that choice to treat people differently because, after all, there can be some justifications. But in these kinds of statistical cases, it's a different kind of case, and so the disparate impact statistics can be a basis to show intent or it can be a pure disparate impact case. That comes much later, as does much more discovery. Look at their underwriting guidelines. We don't know what they say. There are other principles, what they've told their loan officers. We haven't deposed any of their loan officers. But, again, in our view, looking at the complaint on its face, the Federal Reserve Board study plus our allegations plus the factual statistics plus our allegations that the objective criteria is already taken into consideration in the buy rate. Counselor, help me understand that a little bit better. The buy rate, you had the overage rate, correct? Correct. The buy rate are the static factors, comprised of the static factors. Right, and they're based on loan sheets that the bank sends to the dealership, which gives you underwriting guidelines. Right. The overage rate is the discretionary rate that you're complaining about. Right. When you look at a file, at a client's file, is that broken down in two different numbers, or do you just have a single loan rate? No, I believe it's broken down in two different numbers. And, to be honest, I don't have a specific answer to that question because I didn't see those files. But it must be broken down into two numbers because we're alleging that the statistical analysis was of the overage rate, the discretionary rate, and that's where the non-Hispanics or the non-Asians were charged higher rates statistically than the Asians. That's where the discrimination crept in to the sales persons dealing with each of the borrowers. And if you have that information broken down in that way, wouldn't the answer to Callahan's question be, yes, we've got a file from an Asian, a file from a non-Asian, they're equal in terms of what the buy rate was, but look at the overage rate. Isn't that simple? Right. And if the majority of those cases which we've alleged, there's a statistical difference that non-Asians were charged higher discretionary overages than the Asians, and when the objective factors are already taken into consideration, that's evidence and that suggests discrimination and certainly nudges the case across from plausible to plausible. I also note that we cite there's at least six district court cases, many coming out of California federal districts, that are virtually identical to this case. They're EECOA cases, same discretionary pricing policy, and in every one of those cases the district court found that the complaint stated a sufficient claim and denied the 12B6 motion. And in most of those cases, if not all of them, the statistical showing was much less than in our case, and we've addressed those in our brief. In those cases, the plaintiff relies on these industry studies or even Federal Reserve Board data that simply aggregated lending data from a bunch of lenders, one of being the defendant in that case, and said those studies were enough statistics to make a plausible claim of discrimination. So this case is much stronger than those cases. We've cited six or eight cases virtually identical, as I said, of the district court, and not on the Court of Appeals because they've denied, obviously, the motion to dismiss, so they weren't appealed. But this case is not novel or complex. And finally, before I conclude, let me just – the district court, the reasons it dismissed the complaint, neither are legitimate. First of all, it looked at the statistics and said our allegation that more than half of the non-Asians were charged higher rates wasn't enough because if more than half were charged more, maybe the other half were charged less, and it washed out. That wasn't the key statistical allegation of the complaint. The key statistical allegation, again, was that we reviewed the loan files, and our statistical analysis showed that the mean overages for non-Asians were significantly higher, and we give those range or basis points for each of the defendants. So the district court completely ignored the key statistical allegation that was made on the statistics. And the second thing, as I've said, the classification of Asians and non-Asians wasn't valid. But here, clearly alleging that discrimination against non-Asians, you can't favor one race or one group of persons over another, even if you're just giving one group a better deal, that's discrimination the same as if you're giving another group a worse deal. So neither of the reasons that the district court in its short opinion gave clearly warrant dismissing the complaint. And under Iqbal and Twombly, properly applied, we certainly believe that taking inferences in favor of the government that we've alleged sufficient facts to make a plausible claim, this Court should reverse and remand and let the case go forward and let there be discovery and let the defendant try to prove his claim. Thank you. Roberts. Roy Weatherup of Lewis, Brisbois, Discard and Smith for FLE Union Auto Sales, Incorporated. I first would like to discuss the Walmart case, which was the subject of my letter last week, which seems to me to be fatal to the positions taken by the government in this case in two ways. First, discrimination of this type as to the members of a group can no longer be proved by statistical evidence of the type offered here. In fact, in this case, if there were discrimination, there would have to be some common amount of discrimination or effect of it. But the ill-defined group alleged to exist by the government was compiled based on as to medical. The procedural posture is a little bit different in Walmart in the sense that it involved class certification. Yes. And this is 12b-6. Yes. So it is a little bit different. I think you are raising some interesting parallels. And in Walmart as well, you had managers that had discretion. Right. And it ended up to be a problem for the class because saying just because they had discretion and just as a result of that, that less women are promoted, that just isn't going to, it's not going to get you there.  That's the second aspect of Walmart. The discretionary authority as a alleged illegal wrongful practice. And the Walmart decision held as a matter of law that a policy of conferring discretion under the circumstances there is not a wrongful policy, but rather it's the absence of a policy. And and in this case, the it's alleged that the car dealers, including my client, had discretion with regard to certain aspects of setting interest rates that were not objective, such as the size of the down payment, the value of a trade in the length of employment. And in things of this character, which are different than mere credit scores, which is the pleadings of the government seem to equate credit scores with credit worthiness. And although credit scores, which measure history of paying debts, are certainly important as an aspect of credit worthiness, they're not the whole picture. It seems to me, though, and your letter, your 28 J letter, just supports this view. Your 28 J letter says, here the government relies upon statistical data as evidence in support of its case, including a disparate impact claim. But my client contends that such evidence should not be considered. We're not at the evidence stage. We are at the pleading stage. And that is what troubles me about what the district court did here, because it's certainly plausible where, I mean, the situation you've set up is it goes to the bank, and the bank's already settled the claims of discrimination against it. It goes to the bank. The bank looks at all this objective data. It doesn't see the purchaser, right? The bank doesn't see the purchaser. The bank looks at this objective data and says whether or not it's going to accept your loan application, right? Yeah. Okay. So it looks at this objective data. It's not looking, I mean, it doesn't, it can't say, oh, you're Mexican, and so I'm worried that you're a higher risk than the Asian. So it doesn't get to make that determination. Then it goes back to the dealer. Now, the dealer, the person on the street, is the one who's actually dealing with the customer. And then somehow in that they're alleging that, and it's an allegation and seems perfectly plausible to me, that the dealer looks at the person and makes certain assumptions, some of which may be legal to make and some of which may be illegal to make. And that's what the government's going to have to prove. But at the pleading stage, they've certainly alleged that. Well, but they have to allege facts to make the claim plausible, and they haven't alleged that. Well, they seem to be saying that's what discovery's for, and they're saying they don't. I don't know. They say they have a certain number of files, which gives them the ability to run the statistics. Could they have gotten anything else out from the files? Do you know what files they're talking about? Yes. There are 1,400 files involving NARA Bank and my client. Do you have the files, too? No. No, they haven't been produced. The bank presumably has them, but they've settled. And according to what the record shows from the government is that they analyzed these 1,400 files and studied surnames and pictures from driver's licenses, photocopies, and determined that about 200 of the 1,400 were Asians and that the discretionary component, according to them, was higher among non-Asians than Asians by a range of essentially a third of a point to a point and a half, which is a rather. . . Now, if that's true, that could be evidence of illegal discrimination. Well, not unless there is a protected class and not unless there's a wrongful, illegal practice. Right, but that's what they're going to prove. They've alleged it. Now, what 12v6 says, you just have to plausibly allege this. Well, but they haven't alleged. They've alleged it, and now you're saying, yeah, but you don't have. . . We weren't discriminating against the protected class. Well, under the law, you could be white and be in the protected class. If there is discrimination specifically against whites, yes. Right, and that's what they have to have or ask for the opportunity to prove. All the cases under the Equal Opportunity Credit Act, as well as under the Civil Rights Act, define a protected class as a class to which a claimant is a member. And here, for the first time in history, the purported protected class is everyone who's not Asian, a group that constitutes 95 percent of the population of this country. Now, counsel, that's an interesting argument. I mean, it's an interesting argument whether non-Asian. I mean, but it's not what was. . . it's not what the district court ruled on the basis of. It's not what you argued in your briefs. Well, I think the district court did find that all of this was not plausible. It was too vague. The district judge did note that the definition of Asian is imprecise, being based on surnames and pictures and files. And all the cases under the Equal Opportunity Credit Act require there to be a protected class, not protected classes. There's no case in reported decisions of the federal court that has created a protected class by aggravating everyone who is white, black, Hispanic, and American Indian as a single protected class, because discrimination under this statute is discrimination against a person, not discrimination in favor of a person. And in order for there to be a valid claim, one has to be in one of the protected classes. And here there are different protected classes that have nothing in common. And. . . Mr. Weatherup, when you discriminate in favor of someone, don't you then logically discriminate against someone else? No, not necessarily. For example, if there were a family-owned business that promoted members of the family who were of the same race, that would not be discrimination based on race. It would be discrimination based on ownership of a company. Isn't Asian a category routinely deployed for the purposes of anti-discrimination laws? Well, Asians certainly would be a protected class, but the class excludes Asians. There's never been a protected. . . The argument is that you were, your client was discriminating in favor of Asians and against probably, I mean, the way I read the allegations, a predominantly Hispanic group. Well, that's what's alleged. There's no breakdown in the purported class between Hispanics and. . . I guess it needs to be at the pleading stage. I mean, that's the. . . I mean, it just, at the pleading stage, if they allege that, it's certainly plausible. And, you know, you can imagine all the reasons that it might be likely that that would be going on. It's just that this particular credit law makes that illegal. I mean, it's like jury selection in a way. Well, if there were a consistent discrimination in favor of Asians, then there wouldn't be this disparity of a third of a point to a point and a half. This shows individual variation. Well, this is what I don't understand. So do I have it right that the bank deals with all the objective stuff, then it goes back to the dealer, and he's dealing with the actual purchaser of the car, and then he tacks on some additional percentage point, which is then shared back with the bank? Well, in fact, the government's allegations as to how it works are incorrect. I'm advised by my client, who is here today, that in fact the bank makes the decision as to the discretionary part based on information provided by the dealer involving the credit application, which shows and the terms of the deal, the most important of which are the price of the car and the amount of the trade-in and length of employment and stability of income and financial assets, prior experience with the customer and all this. Would the 1300 files contain that information? They contain the information that is submitted by the dealership to the bank. All right, so would you concede if they went in their files and they found an Asian person and a non-Asian person that had similar credit scores, you know, on that part, but then on the discretionary part, both have been employed for two years at their job, both bought the same car and were putting down the same down payment, but the Asian person got a different discretionary point than the other, that that would be enough to push it from possible to plausible? As to an individual claim, it might be. But given these discretionary, somewhat subjective factors, there's no way that that hypothetical could apply to each of 1,200 files. And that's why here we have this variation from a third of a point to a point and a half, which is it shows that all these discretionary determinations are individual in character, just like in the Wal-Mart case. And I think the language in the Wal-Mart case applies not just to class certification, but also to what the law requires to state a claim, and that mere statistical. But Wal-Mart was really applying all the Rule 23 factors of commonality and typicality and numerosity, all of those things that we're not looking at here. I don't see how you can apply those same ideas into this context. The United States is not bringing this as a class action, or even in a representative capacity. Well, I think the language of the Supreme Court is not limited to class certification. For example, it stated the mere claim by employees of the same company that they have suffered a Title VII injury or even a disparate impact Title VII injury gives no cause to believe that all their claims can be productively litigated at once. And this is ñ That's exactly my point. The Supreme Court was saying you can't take ñ you can't have the largest nationwide class in the history of the world and litigate all their claims in one piece of litigation under Rule 23. Well, I think this language also means that mere statistical differences cannot show ñ this is what we have here. The government is trying to aggregate 1,200 claims, and this ñ you can't do it. If there were an individual claim where it could be shown that a particular individual had identical information, both objective and subjective, discretionary, and they were treated differently, that would be an individual claim, perhaps. But you can't just say everyone who is not Asian constitutes a protected class and you look at the classes to get ñ compare the classes rather than the individuals. All right. Thank you, counsel. You've reached ñ you're over your time. Thank you very much. All right. Thank you, counsel. Does anybody have any other questions? No? All right. This case will be submitted, and the Court will adjourn for the day. Thank you. You went over. You had no rebuttal time left. Yes. There's always more people want to say.
judges: Martinez, Wardlaw, Callahan